******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE SHANE M.*
(SC 19295)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued October 24, 2014—officially released August 28, 2015***

*Jon L. Schoenhorn*, with whom was *Irene J. Kim*, for the appellant (respondent father).

*Carolyn Signorelli*, assistant attorney general, with

whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Joshua Michtom*, assistant public defender, filed a brief for the Office of the Chief Public Defender as amicus curiae.

*Opinion*

ROGERS, C. J. The primary issue in this appeal is whether the trial court properly relied on certain conduct of the respondent father, Matthew M. (respondent), in granting the petition to terminate his parental rights. The respondent appeals from the judgment of the Appellate Court affirming the trial court's decision to terminate his parental rights as to his minor child, Shane M., and to appoint the petitioner, the Commissioner of Children and Families (commissioner), as statutory parent. *In re Shane M.*, 148 Conn. App. 308, 330, 84 A.3d 1265 (2014). The respondent claims that the Appellate Court improperly affirmed the trial court's judgment terminating his parental rights pursuant to General Statutes § 17a-112 (j) (3) (B)[1] because the trial court allegedly relied on conduct not within the scope of the court-ordered specific steps when concluding that the respondent failed to rehabilitate, that there was insufficient evidence to support a finding that he had failed to rehabilitate, and that the trial court unfairly drew an adverse inference from his refusal to submit to a drug test. We reject these claims and affirm the judgment of the Appellate Court.

The following facts, which the trial court found by clear and convincing evidence, and procedural history are relevant to the resolution of this case. The respondent is the biological father of Shane, who was one day shy of his third birthday when the respondent's parental rights were terminated on April 30, 2013. Three days after Shane was born, the Department of Children and Families (department) responded to a report that Shane's mother[2] was homeless and refused to check in to a shelter. Approximately one month later, on June 8, 2010, police responded to a report of domestic abuse between the respondent and Shane's mother. The respondent refused to give Shane's car seat base to Shane's mother and physically moved her out of his way. The respondent then got into his car, at which point Shane's mother jumped on top of the respondent's car. The respondent started to drive away and caused Shane's mother to fall to the ground. As a result of this incident, both the respondent and Shane's mother were charged with breach of the peace and a protective order was issued between the two.

On August 23, 2010, the commissioner filed a petition of neglect based, in part, on the respondent's history of substance abuse, the history of violence between the respondent and Shane's mother and their recent cohabitation despite four protective orders against their doing so, the respondent's unaddressed mental health issues, and the fact that Shane was only three months old at the time and was incapable of protecting himself against violence. At that time, the department referred the respondent to Radiance Innovative Services (Radiance) for parenting education and to the Alcohol and

Drug Rehabilitation Center for substance abuse evaluation and counseling.

The respondent participated in a clinical assessment at Radiance on September 26, 2010. After that assessment, he was diagnosed with "adjustment disorder with mixed anxiety and depressed mood, [attention deficit hyperactivity disorder] by history and cannabis abuse by history." Radiance staff recommended that the respondent start long-term therapy to address symptoms of depression, anxiety, feelings of abandonment by his mother, and past dysfunctional relationships.[3]

Two days later, the respondent went to the residence of Shane's mother and tried to break down the door with a chair. As a result of that incident, he was arrested for breach of the peace and trespassing, and a full protective order was issued against him.[4]

On November 16, 2010, due to the ongoing criminal issues and arrests and domestic violence regarding the respondent and Shane's mother, the commissioner invoked a ninety-six hour hold on behalf of Shane. Three days later, the commissioner filed a motion for order of temporary custody (order), which was granted and subsequently sustained in a preliminary hearing on November 24, 2010. At that hearing, the respondent received and agreed to court-ordered specific steps to facilitate reunification with Shane. The steps required him, inter alia, to participate in parenting counseling at Radiance to learn safe and nurturing parenting, and individual counseling at North Central Counseling to address issues of depression and anger management; to submit to random drug screens with the time and method of testing determined by the department; to refrain from using illegal drugs or abusing alcohol or medicine; to cooperate with court-ordered evaluations or testing; to have no further involvement with the criminal justice system; and to cooperate with service providers' recommendations for parenting, individual and family counseling, in-home support services and/or substance abuse assessment treatment.[5]

During the respondent's initial Radiance sessions, he was considered "very focused and actively involved in the program," and he completed an in-home father to father program on December 28, 2010. He was then referred to a nonviolence alliance program in January, 2011, to address issues of domestic violence. At that program, the respondent reported that he "did not feel that he was in need of domestic violence services and stated that he was the victim in the relationship with [Shane's] mother." In February, 2011, the respondent was referred to services at Community Health Resources for "psychiatric treatment and individual counseling." The report from the respondent's psychiatric evaluation indicated that the respondent "had no past history of violence and . . . tried marijuana occasionally and denie[d] being addicted." The trial court

noted, however, that the information contained in the report "appear[ed] to be self-reported by [the respondent]." Notably, the report "[did] not indicate that any independent sources were contacted nor that any medical records were reviewed by the evaluator." The respondent subsequently stated that he "did not want to participate in services" and that he attended "only . . . to appease [the department] . . . ."

In March, 2011, the respondent pleaded nolo contendere to the commissioner's neglect petition, and the trial court reiterated all but one of the specific steps the respondent previously had been ordered to follow. By this time, Shane had been in the commissioner's custody for five months.

The respondent's Radiance sessions resumed in April, 2011, but he missed several; when he did attend, he continued to express that he did not need therapy and presented with "a very high anxiety level and with problems coping with stress."

In May, 2011, the respondent was arrested for possession of a controlled substance and for driving unreasonably fast. Following the arrest, which the respondent did not report to the department, he tested positive for marijuana on August 18, September 2, September 9 and September 16, 2011.[6] As a result of these positive screens, the respondent was referred to an Alcohol and Drug Rehabilitation Center program. He was subsequently discharged from the program because he missed three scheduled appointments starting in October, 2011, and subsequently tested positive for marijuana in a hair follicle drug screen.

Pursuant to General Statutes § 46b-129 (k) (1)[7] and Practice Book § 35a-14,[8] which reflect the legislature's intent that committed children be provided with permanency and stability, the department filed a motion to review its proposed permanency plan for Shane. The trial court approved the permanency plan of terminating parental rights on September 27, 2011.[9] At this point, Shane had been in the commissioner's custody for ten months.

In November, 2011, the respondent was again referred to participate in a parenting program. He continued to engage in supervised visits with Shane and did a "good job parenting" but was "sometimes nervous . . . ." His supervising social worker noted that the respondent could benefit from additional parenting education, because he tended to become hyperactive and because he was limited by his attention deficit hyperactivity disorder. A parenting mentor was also recommended for the respondent as "he appeared to be overwhelmed with handling the needs of an active toddler and a baby[10] but [he] refused, feeling he did not need assistance with his parenting" and that he was fully capable of raising Shane himself. (Footnote added.)

After the respondent had completed the domestic violence group sessions and while he continued to attend Radiance sessions, he was arrested for disorderly conduct on November 27, 2011. The respondent, who had become upset with his grandfather while in his grandfather's home, went outside and returned with a can of gasoline and began to pour it on the kitchen floor. He then threatened to light the house on fire. He reportedly also kicked the family dog repeatedly. After this arrest, the court entered a protective order between the respondent and his grandfather. On February 10, 2012, he was sentenced to three months in jail, execution suspended, and probation for one year.[11]

On November 23, 2011, the department petitioned the court to terminate the respondent's parental rights. At this point, Shane had been in the commissioner's custody for thirteen months. Yolanda Leon, a department social worker, submitted a social study in support of the petition, opining that, "[s]ince the time of [Shane's] removal, [the respondent] has not adequately addressed his mental health needs [or] substance abuse, and has only recently begun to address domestic violence." She noted that the respondent had not maintained contact with the department or informed it of his living situation, but that he was employed full time. In addition, Leon submitted that the respondent "continues to deny that he smoked marijuana and . . . does not want to do a new substance abuse evaluation and hair test, however [the respondent] stated he would cooperate."

In February, 2012, the respondent again tested positive for marijuana. Over the next month, the respondent showed "increased anxiety" and "was less focused during his individual counseling" at Radiance. The next three urine drug screens that the respondent took for marijuana were negative.

After the respondent was discharged from the Alcohol and Drug Rehabilitation Center for failing to attend three scheduled appointments, he asked to be referred to another program for substance abuse and mental health. He arrived late to his first evaluation, however, and could not be evaluated. He then requested to be referred to an agency closer to his home and began a program at Community Health Resources on June 13, 2012. In the same month, the respondent tested positive for marijuana in a hair follicle drug screen. Thereafter, he was recommended for group therapy but "refused to participate." At this point, Shane had been in the commissioner's custody for seventeen months.

Derek A. Franklin, a licensed clinical psychologist, conducted a court-ordered evaluation of the respondent in September, 2012. He diagnosed the respondent with attention deficit hyperactivity disorder, generalized anxiety disorder and cannabis abuse and antisocial

traits. He posited that the respondent had a high potential for relapse, continued use or craving for cannabis that needed to be monitored and addressed. Clinical testing indicated that the respondent presented elevations in the domains of "[attention deficit hyperactivity disorder], anxiety, paranoia, substance abuse, and anti-social [traits] and aggression." Franklin described the respondent as "future oriented and optimistic," but he also saw "sufficient evidence of mood dysregulation exacerbated by anxiety." In particular, clinical testing for anxiety suggested "prominent worry . . . [which] may be of such magnitude that concentration and [attention] are compromised." Franklin noted that "[i]ndividuals with similar profiles may typically misuse substances to obtain both emotional control and management of anxiety."

Franklin further determined that the respondent scored in "the clinically relevant range for paranoia." Franklin opined that the respondent was "hypervigilant" and "overly suspicious," and that he "closely monitor[ed] his environment for evidence that others [were] out to harm him." The clinical personality assessments that Franklin conducted indicated that the respondent maintained "hostility and mistrust of even close relationships," that he was "easily insulted and tend[ed] to hold grudges . . . [was] quick to anger . . . [and was] more likely to use verbal reasoning than physical aggression." Testing indicated further, however, that the respondent "may become frustrated easily and when provoked will not back down from confrontation. This may lead to physical acts of violence. He otherwise possess[ed] adequate common sense reasoning," while his judgment remained "situation specific."

Franklin determined that the respondent's "anxiety, mood dysregulation and [attention deficit hyperactivity disorder] marginally impact[ed] his day-to-day functioning," but that these conditions "are likely to be exacerbated . . . under the weight of emotional and psychological distress." Franklin urged that the respondent receive treatment for these concerns, as well as for his substance abuse. He offered further recommendations, concluding that "[i]t is imperative that [the respondent] be referred for a psychiatric consultation . . . to identify medication that could be useful in ameliorating or managing symptoms of mood dysregulation, anxiety and [attention deficit hyperactivity disorder]. Without medication, [the respondent] is likely to continue to have problems." Franklin further recommended that the respondent participate in additional domestic violence classes to rectify his "inability to manage anger and hostility under the weight of emotional distress . . . ." Although the respondent claimed that he had not used marijuana in more than one year despite his positive drug screens three and six months prior, Franklin "strongly advise[d]" that the respondent participate in more substance abuse groups given that

he had previously refused to participate in substance abuse groups and because "clinical data suggests that at the very minimum he continues to crave cannabis and, therefore, is subject to relapse." On the basis of these unaddressed concerns, Franklin ultimately recommended termination of the respondent's parental rights.

The respondent completed counseling at Community Health Resources on December 27, 2012, and no further treatment was recommended. Thereafter, the respondent's urine screens were negative. He refused, however, to engage in hair follicle testing after December, 2012.

A trial was held on the termination of parental rights on October 2, 2012, January 4, 2013, and March 18, 2013. In the adjudication phase,[12] the trial court found by clear and convincing evidence that the department had made reasonable efforts to rehabilitate the respondent and to reunify him with Shane, and that the respondent had failed to rehabilitate or sufficiently benefit from the department's services. The trial court determined that the respondent had "not gained sufficient insight into his long-standing issues." The trial court found especially troubling that the respondent continually asserted that he participated in the services only to appease the department, and that he repeatedly refused to cooperate with court-ordered recommendations. It also found disconcerting the fact that the respondent continued to state that he did not engage in substance abuse, yet refused to engage in substance abuse hair testing. The trial court was further concerned by the respondent's refusal to engage in a psychiatric evaluation to determine whether he required medication and that he did not make efforts "within a timely manner to adjust [his] circumstances or [his] conditions to the extent that [the department] would be able to reunify [him] with Shane. [He has] failed to fully meet or comply with the court-ordered steps and [he is] still unable to care for Shane."

In the dispositional phase; see footnote 12 of this opinion; the trial court considered Shane's age and feelings and emotional ties he had with his foster parents, the efforts the respondent had made to adjust his own conditions to facilitate Shane's return to his home, and the fact that no other person's unreasonable conduct had prevented the respondent from maintaining a relationship with Shane, in determining that termination of the respondent's parental rights was in Shane's best interest. On April 30, 2013, the trial court terminated the respondent's parental rights and appointed the commissioner as Shane's statutory parent.

The respondent appealed to the Appellate Court from the trial court's judgment, arguing that the trial court "improperly (1) terminated his parental rights pursuant to . . . § 17a-112 (j) based on an overly broad interpretation of that statute; (2) terminated his parental rights

based on insufficient evidence; (3) drew an adverse inference against the respondent without prior notice; and (4) terminated his parental rights because § 17a-112 (j) (3) (B) is unconstitutionally vague as applied to him." *In re Shane M.*, supra, 148 Conn. App. 310. The Appellate Court affirmed the judgment of the trial court. Id., 330. We granted the respondent's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the trial court correctly determined that the respondent 'failed to rehabilitate' and thus correctly terminated his parental rights?" *In re Shane M.*, 311 Conn. 930, 86 A.3d 1056 (2014).

On appeal, the respondent claims that the Appellate Court improperly affirmed the termination of his parental rights for failure to rehabilitate under § 17a-112 (j) (3) (B), because the trial court relied (1) on conduct of the respondent not encompassed by the court-ordered specific steps, and (2) that in the absence of such conduct, there was insufficient evidence to find that he had failed to rehabilitate. The respondent further claims that the Appellate Court improperly affirmed the trial court's finding that he continued to use cannabis on the basis of his refusal to submit to a drug test, and that the trial court's decision to draw an adverse inference from that refusal was fundamentally unfair.

We conclude that it was proper for the trial court to rely on all of the respondent's contested conduct in its decision to terminate his parental rights,[13] and that the trial court's determination that the respondent had failed to achieve sufficient rehabilitation was supported by clear and convincing evidence. Finally, we conclude that it was not unreasonable for the trial court to draw an adverse inference from the respondent's refusal to submit to a drug test. Accordingly, we affirm the Appellate Court's judgment.

I

We first set forth the applicable standard of review and general principles.[14] The trial court is required, pursuant to § 17a-112, "to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. *In re Marvin M.*, 48 Conn. App. 563, 578, 711 A.2d 756, cert. denied, 245 Conn. 916, 719 A.2d 900 (1998). Rehabilitate means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has

achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life." (Internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999). In addition, "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 150–51, 962 A.2d 81 (2009), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 754, 91 A.3d 862 (2014).

When a child is taken into the commissioner's custody, a trial court must issue specific steps to a parent as to what should be done to facilitate reunification and prevent termination of parental rights. *In re Elvin G.*, 310 Conn. 485, 507–508, 78 A.3d 797 (2013); see also General Statutes § 46b-129 (b), (c) (6) and (j) (3).[15] The respondent's claims implicate the meaning and scope of the specific steps, which constitute an order of the court. Generally, court orders "are to be construed in the same fashion as other written instruments," with the determinative factor being the intention of the court. (Internal quotation marks omitted.) *State* v. *Denya*, 294 Conn. 516, 529, 986 A.2d 260 (2010). Specific steps may be augmented with supplemental orders, per the trial court's discretion. *In re Leah S.*, 284 Conn. 685, 696, 935 A.2d 1021 (2007). "[The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome." *In re Elvin G.*, supra, 508. "Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.) Id.

Finally, we take this opportunity to clarify our standard of review of a trial court's finding that a parent has failed to achieve sufficient rehabilitation.[16] We have historically reviewed for clear error *both* the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. See, e.g., id., 499. While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings,[17] we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly, we now believe that the appropriate standard of review is one of evidentiary sufficiency, that is, "whether the trial court could have reasonably concluded, upon the facts established and the reason-

able inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Citation omitted.) *In re Soncheray H.*, 42 Conn. App. 664, 668, 680 A.2d 1363, cert. denied, 259 Conn. 940, 684 A.2d 712 (1996).

Turning to the case before us, the respondent contends that three of the findings that the trial court relied on did not fall within the scope of the court-ordered specific steps, namely, that the respondent: (1) rejected the assistance of a parental aide in a clinical setting; (2) participated in ordered programs only to " 'appease' " the department rather than acknowledging that he needed the programs; and (3) declined to undergo a psychiatric consultation, as recommended by Franklin, to determine whether he might benefit from medication for attention deficit hyperactivity disorder and his other mental health issues.[18] We will examine each factor in turn.

The court properly considered that the respondent rejected the assistance of a parental aide during visitation with Shane, because such a finding is clearly covered by the specific steps requiring the respondent to (1) "[t]ake part in counseling and make progress toward the identified treatment goals," (2) learn "safe [and] nurturing parenting," and (3) "[c]ooperate with service providers recommended for parenting . . . counseling." While the respondent did participate in weekly visitations, parenting classes, and a parenting education course, he failed to comply fully with these identified specific steps when he declined a parenting mentor service to help him learn how to balance the needs of Shane and his new baby.

The trial court also properly considered the respondent's repeated statements that he attended court-ordered rehabilitation programs only to appease the department. The specific steps required the respondent to (1) cooperate with service providers and make progress toward improving his parenting, while learning appropriate child development, and (2) address his issues of depression and anger management. The court-ordered programs would serve little purpose if a participant is merely going through the motions to appease the department, rather than working sincerely toward actual improvement. Indeed, the respondent's claim that his "personal motivating factors for [his] participation in programs [have] absolutely no role to play under . . . § 17a-112 (j) (3) (B)" is not only unsupported by any legal citation, but is also stunningly contrary to common sense. We agree, therefore, with the Appellate Court's determination that the respondent's "failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a fail-

ure to achieve a sufficient degree of personal rehabilitation. See *In re Kamora W.*, 132 Conn. App. 179, 190, 31 A.3d 398 (2011) (respondent refused to acknowledge drug or alcohol problem); *In re Jocquyce C.*, 124 Conn. App. 619, 626–27, 5 A.3d 575 (2010) (respondent failed to acknowledge habitual involvement with domestic violence); *In re Christopher B.*, 117 Conn. App. 773, 784, 980 A.2d 961 (2009) (respondent blamed others for problems); *In re Jermaine S.*, 86 Conn. App. 819, 834, 863 A.2d 720 (respondent's inability to admit she had substance abuse problem 'thwarted her ability to achieve rehabilitation'), cert. denied, 273 Conn. 938, 875 A.2d 43 (2005); *In re Sheila J.*, 62 Conn. App. 470, 481, 771 A.2d 244 (2001) (respondent failed to recognize her need for recommended counseling)." *In re Shane M.*, supra, 148 Conn. App. 322.

Finally, the respondent's refusal to undergo a medical assessment by a psychiatrist for controlling his diagnosed attention deficit hyperactivity disorder and other mental health issues clearly contravenes the specific steps requiring him to cooperate with court-ordered evaluations and testing and with recommendations regarding assessment and treatment. As detailed by the trial court, the respondent had a history of serious mental health issues, including suicidal gestures, and had been diagnosed in a clinical assessment with, inter alia, mixed anxiety and depressed mood and attention deficit hyperactivity disorder. The respondent's contention that "[n]owhere in [the] record is there any evidence that [he] needed medication for [attention deficit hyperactivity disorder] or anxiety" ignores the recommendation made by Lisa Sargis, a social worker for Radiance, who reported that he could benefit from an assessment for medication and the testimony of Leon that she had discussed Sargis' recommendation for a medical evaluation with the respondent prior to November, 2012. Moreover, the court properly relied on Franklin's testimony about the unreliability of the report of the respondent's February, 2011 psychiatric evaluation, which was based on the respondent's selective and inaccurate description of his personal history and which had spurred Franklin's recommendation for a second evaluation. As we have repeatedly stated, "[c]ourts are entitled to give great weight to professionals in parental termination cases." (Internal quotation marks omitted.) *In re Melody L.*, supra, 290 Conn. 161. We therefore conclude that the trial court properly found that the respondent had adequate notice via his specific steps that he needed to complete an assessment to determine whether medicine might help him control his mixed anxiety, depressed mood and attention deficit hyperactivity disorder.[19]

For all the foregoing reasons, we conclude that the respondent had ample notice of all of the steps with which he was expected to comply, and that the conduct of the respondent that the court considered in terminat-

ing his parental rights fell within the scope of the court-ordered specific steps that were provided to the respondent on two separate occasions.

## II

We next consider whether there was sufficient evidence for the trial court to find by clear and convincing evidence, that the respondent failed to achieve sufficient rehabilitation that "would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B). Our careful review of the record and lengthy recitation of the factual findings made by the trial court reveals that the extensive evidence credited by the court strongly supports its determination that the respondent had failed to achieve sufficient rehabilitation to be able to parent Shane within a reasonable period of time. In particular, the trial court found that the respondent was reported for domestic abuse, charged with breach of the peace and was subject to a protective order after he refused to deliver Shane's car seat base to Shane's mother, physically moved her away, and then drove his car while Shane's mother was on top of the car, causing her to fall. The trial court found further that for a period of time, the respondent cohabited with Shane's mother, despite four protective orders between the two for domestic violence. The day after the respondent was diagnosed with adjustment disorder with mixed anxiety and depressed mood, attention deficit hyperactivity disorder, and cannabis abuse, he was arrested for breach of the peace and trespassing when he tried to break down the door at the residence of Shane's mother with a chair. The respondent's first psychiatric evaluation appeared to be self-reported and inaccurate. He continued to exhibit a very high anxiety level and problems coping with stress despite the department's continued efforts to assist him through counseling. He was arrested for possession of a controlled substance and for driving unreasonably fast, which he did not report to the department. He was sentenced to three months in jail for disorderly conduct, after he had completed domestic violence sessions and after the department had petitioned to terminate his parental rights, for pouring gasoline on his grandfather's kitchen floor and for repeatedly kicking the family dog. The respondent continued to test positive for marijuana from August, 2011, to after the department petitioned to terminate his parental rights and up until June, 2012, less than four months before his trial commenced. The respondent did not attend some counseling sessions, refused to participate in others, or participated only to satisfy the department. In sum, the respondent "fail[ed] to continue with substance abuse treatment . . . [needed] active monitoring and testing for drug abuse . . . [lacked] insight in addressing his ongoing anger issues

. . . [needed] a comprehensive evaluation concerning his medication needs, and . . . [failed] to achieve sufficient personal rehabilitation after such an extensive period of time . . . ."

Although the respondent encourages us to focus on the positive aspects of his behavior and to ignore the negatives, we will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court. See *In re Melody L.*, supra, 290 Conn. 148. We simply cannot find fault with the trial court's reasoning that, "[a]lthough [the respondent] participated in most of the services, albeit with varying degrees of motivation, [his] failure to adequately address [his] substance abuse, mental health and domestic violence issues remain significantly deficient." Thus, we conclude that the trial court reasonably determined, based on its factual findings and the reasonable inferences drawn therefrom, that the respondent failed to achieve sufficient rehabilitation that would encourage the belief that, within a reasonable time, he could assume a responsible position in Shane's life.[20]

### III

Finally, the respondent claims that the trial court improperly inferred that he continued to engage in substance abuse on the basis of his refusal to submit to a hair follicle drug test, without informing him first that such an inference could occur. He analogizes the adverse inference drawn from his refusal to submit to a court-ordered drug test to one drawn from a parent's failure to testify at termination proceedings and contends that the trial court acted in violation of Practice Book §§ 32a-1 (h) and 35a-7A,[21] as well as General Statutes § 46b-137 (d),[22] in reasoning as it did. Specifically, the respondent claims that failing to notify him of the possibility of such an inference constituted trial by ambuscade and deprived him of the right to a fair trial. We conclude that the respondent had adequate notice of the consequences of his failing to adhere to the specific steps ordered by the trial court and that the trial court properly inferred that the respondent continued to engage in substance abuse.

As a general matter, the trial court may, "[i]n the absence of an express statutory provision to the contrary . . . draw all fair and reasonable inferences from the facts and circumstances [that] it finds established by the evidence . . . ." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 635–36, 847 A.2d 883 (2004). "[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence

supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference." (Internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 857, 37 A.3d 700 (2012).

Here, the respondent was issued, and agreed to, specific steps requiring him to refrain from drug use and to submit to drug testing as required by the department. For that reason alone, his claim of unfair surprise from the negative inference resulting from his refusal to take a drug test is meritless. As to the reasonableness of the trial court's inference, after Shane was taken into the commissioner's custody, the respondent was arrested on cannabis charges, and he tested positive for marijuana on five separate occasions. As a result of the positive screens, the respondent was referred for further substance abuse and mental health assessments; however, he did not attend his scheduled appointments. Although some of the respondent's subsequent urine tests were negative, Franklin testified that these tests "were woefully inadequate . . . because people can fake a urine test. Anyone with any experience with working on the Internet can find ways that you can dilute the solution or drink things to dilute the solution, which is typically why you want urinalysis and hair analysis." Accordingly, the trial court was cognizant of the potential for the respondent to either relapse into substance abuse or to manipulate his urine tests. Given the foregoing, the respondent certainly had notice that refusing to submit to drug testing could cause the trial court to conclude that he was not drug free and, therefore, increase the chance that his parental rights would be terminated. In short, the trial court reasonably inferred, based on the respondent's proven past drug use and his refusal to submit to testing, *as his specific steps required*, that he had continued to use marijuana.[23]

We also reject the respondent's contention that an adverse inference drawn from the failure to testify and an unfavorable inference drawn from the refusal to submit to court-ordered drug screens are so analogous that the same procedural safeguards should apply. To the extent this claim requires us to interpret the scope of a rule of practice, our review is plenary. *State* v. *Sheriff*, 301 Conn. 617, 622, 21 A.3d 808 (2011).

Both Practice Book § 32a-1 (h) and General Statutes § 46b-137 (d), by their explicit terms, apply only to "confession[s], admission[s] or statement[s]" that are "written or oral," and the respondent does not explain how a refusal to take a drug test falls within this language. See, e.g., *State* v. *Campfield*, 44 Conn. App. 6, 17, 687 A.2d 903 (1996), cert. denied, 240 Conn. 916, 692 A.2d 814, cert. denied, 522 U.S. 823, 118 S. Ct. 81, 139 L. Ed. 2d 39 (1997) (test designed to detect gun powder residue

"does not involve testimony or communications, [thus] the refusal to submit to it does not constitute invocation of the right to remain silent, and admission of the evidence of such refusal does not constitute commentary on a defendant's choice to remain silent"); *In re Kasmaesha C.*, 148 Conn. App. 666, 679 n.9, 84 A.3d 1279 (court's reliance on respondent's competency evaluation in assessing respondent's ability to achieve rehabilitation not plain error), cert. denied, 311 Conn. 937, 88 A.3d 549 (2014). "[C]ompulsion which makes a suspect or accused the source of real or physical evidence does not violate a person's constitutional rights as it is not such as compels communications or testimony." (Internal quotation marks omitted.) *State* v. *Campfield*, supra, 16. We thus conclude that the Appellate Court properly declined to expand the parent and child testimonial "right to silence" articulated in Practice Book § 32a-1 (h) and General Statutes § 46b-137 and discussed in *In re Samantha C.*, supra, 268 Conn. 635–36, to the refusal to submit to a court-ordered drug test.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, EVELEIGH, McDONALD and ESPINOSA, Js., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** August 28, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition [terminating parental rights] if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . (ii) and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[2] The trial court also terminated the parental rights of Shane's mother, who is not involved in the present appeal. The respondent and Shane's mother had a second child on December 20, 2011, who is referred to in this opinion as the "baby."

[3] The trial court detailed the respondent's extensive personal history of neglect and mental health issues: "[The respondent's] history with [the department] commenced when he was a child dating back to 1993. He was committed to [the department's] care in August, 1999, due to issues of physical neglect, substance abuse and lack of adequate supervision. [The respondent] was placed with his paternal grandmother via subsidized transfer of guardianship. He was diagnosed with attention deficit hyperactivity disorder as a child and was prescribed Ritalin.

"[The respondent] met [Shane's] mother in 2007 during high school. [The respondent] had [Shane's] mother stay at his grandparents' home when she was no longer allowed to stay with her aunt. [The respondent] did not have his grandmother's permission to do so and both [the respondent] and [Shane's] mother left the home. [The respondent] and [Shane's] mother then began sleeping in the train station or in [the respondent's] car. Thereafter, [the respondent] requested permission from his grandparents for [Shane's] mother to reside with them. When his grandparents refused, [the respondent] threatened to hang himself. [The respondent] was transported to the hospital after an attempted hanging at his grandparents' residence. When [Shane's] mother became pregnant with Shane in 2009, [the respondent] got an apart-

ment where he and [Shane's] mother resided for approximately four months. [The respondent] was not able to continue to pay the rent and was not able to continue living with [Shane's] mother, so he returned to reside at his grandparents' home. . . .

"[The respondent] has a history of mental health issues. [The respondent] was admitted to the Institute of Living in June, 1999, for four days. He was diagnosed with depressive disorder and cannabis abuse. He was discharged and was prescribed Celexa on a daily basis and [it] was recommended [that he] attend North Central Counseling. [The respondent] did not continue to take the medication and did not follow up with attendance for the therapy. [The respondent] does not believe he has any current medical issues nor does he feel he needs any mental health services." (Footnote omitted.)

[4] The trial court also detailed the respondent's domestic violence and criminal history: "He was convicted of breach of the peace [in the second degree] on December 10, 2009, for which he was sentenced to [ninety] days in jail, execution suspended and a conditional discharge for one year; possession of a controlled substance on May 3, 2011, for which he received a nolle." He was also arrested for disorderly conduct on November 27, 2011, for threatening his grandfather and regularly kicking his dog.

"There have been a total of four protective orders between [Shane's] mother and [the respondent] with [Shane's] mother being the protected person in three. The most recent protective order expired on September 28, 2010."

[5] The respondent's complete specific steps were: (1) to keep all appointments with the department and cooperate with the department's home visits, announced or unannounced, and visits by Shane's court-appointed attorney and/or guardian ad litem; (2) to let the the department and his and Shane's attorney know his and Shane's whereabouts at all times; (3) to participate in parenting counseling at Radiance and individual counseling at North Central Counseling to address issues of depression and anger management; (4) to participate in in-home support services referred by the department and cooperate with them; (5) to submit to substance abuse evaluation and follow the recommendations about treatment; (6) to submit to random drug screenings, the time and method of testing determined by the department; (7) to not use illegal drugs or abuse alcohol or medicine; (8) to cooperate with service providers recommended for parenting and individual counseling, in-home support services and/or substance abuse assessment and treatment, including the nonviolence alliance program for domestic violence counseling, Radiance for parenting, and North Central Counseling for individual counseling; (9) to cooperate with court-ordered evaluations or testing; (10) to sign releases allowing the department to talk to service providers to check on attendance, cooperation and progress toward identified goals and for use in future proceedings with the court; (11) to get or maintain a home and a legal source of income; (12) to immediately inform the department of any changes in the make-up of the household to make sure that the change does not hurt the health and safety of the child; (13) to cooperate with any protective or restraining order or safety plan approved by the department to avoid more domestic violence incidents; (14) to have no further involvement with the criminal justice system and to follow conditions of probation or parole; (15) to take care of Shane's physical, medical, or emotional needs, including keeping Shane's appointments with his medical, psychological, psychiatric, or educational providers; (16) to make all necessary child-care arrangements to make sure Shane is properly supervised and cared for by appropriate caretakers; (17) to keep Shane in the state; and (18) to visit Shane as often as the department permits.

[6] The respondent tested negative for marijuana in a random urine screen on August 25, 2011.

[7] General Statutes § 46b-129 (k) (1) provides in relevant part: "Nine months after placement of the child . . . in the care and custody of the commissioner pursuant to . . . an order issued by a court of competent jurisdiction . . . the commissioner shall file a motion for review of a permanency plan . . . ."

We note that § 46b-129 (k) (1) has been changed since the time of the department's motion for review of the proposed permanency plan. See, e.g., Public Acts, Spec. Sess., June, 2012, No. 12-1, § 273; Public Acts 2013, No. 13-234, § 71. Those changes, however, are not relevant to this appeal. For purposes of convenience and clarity, we refer to the current revision of the statute.

[8] Practice Book § 35a-14 is substantially similar in substance to General Statutes § 46b-129 (k) (1) and any dissimilarities are not relevant to this

claim.

[9] General Statutes § 46b-129 (k) (2) provides in relevant part: "At a permanency hearing held in accordance with the provisions of subdivision (1) of this subsection, the court shall approve a permanency plan that is in the best interests of the child . . . and takes into consideration the child's . . . need for permanency. . . ."

We note that § 46b-129 (k) (2) has been changed since the time of the trial court's approval of the permanency plan. See Public Acts, Spec. Sess., June, 2012, No. 12-1, § 273. Those changes, however, are not relevant to this appeal. For purposes of convenience and clarity, we refer to the current revision of the statute.

[10] See footnote 2 of this opinion.

[11] The respondent successfully completed his probationary period on February 10, 2013.

[12] "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 500, 78 A.3d 797 (2013). "If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 163, 962 A.2d 81 (2009), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 754, 91 A.3d 862 (2014); see also General Statutes §§ 17a-112 (k) and 45a-717 (h).

[13] Because we conclude that the conduct of the respondent on which the trial court relied was clearly related to the respondent's specific steps, we need not decide in this case whether § 17a-112 (j) (3) (B) permits a court to consider conduct that is unrelated to the articulated steps.

[14] Although it is not clear that the respondent's claims were raised at trial, at least not with precision, we nevertheless will review them because minimal requirements for review are met and we conclude that the respondent cannot prevail on his claims. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 158 n.28, 84 A.3d 840 (2014) ("[r]eviewing an unpreserved claim when the party that raised the claim cannot prevail is appropriate because it cannot prejudice the opposing party and such review presumably would provide the party who failed to properly preserve the claim with a sense of finality that the party would not have if the court declined to review the claim").

[15] General Statutes § 46b-129 (b) provides in relevant part: "Upon issuance of an ex parte order [vesting temporary custody of a child in an agency or suitable person], the court shall provide to the commissioner and the parent or guardian specific steps necessary for each to take to address the ex parte order for the parent or guardian to retain or regain custody of the child or youth. Upon the issuance of such order, or not later than sixty days after the issuance of such order, the court shall make a determination whether the Department of Children and Families made reasonable efforts to keep the child or youth with his or her parents or guardian prior to the issuance of such order and, if such efforts were not made, whether such reasonable efforts were not possible, taking into consideration the child's or youth's best interests, including the child's or youth's health and safety. . . ."

General Statutes § 46b-129 (c) (6) provides in relevant part: "The court, after a hearing pursuant to this subsection, shall order specific steps the commissioner and the parent or guardian shall take for the parent or guardian to regain or to retain custody of the child or youth . . . ."

General Statutes § 46b-129 (j) (3) provides in relevant part: "The court shall order specific steps that the parent must take to facilitate the return of the child or youth to the custody of such parent."

[16] On May 20, 2015, we ordered, sua sponte, the parties to submit supplemental briefs on the appropriate standard of review.

[17] By way of example, these findings include whether the parent has gained insight into his or her mental health issues, complied with recommendations stemming from his or her specific steps, as well as the trial court's observations of the parent and the conduct of the parent during the course of termination proceedings.

[18] The respondent also claims that a fourth finding by the trial court,

namely, that the respondent continued to use marijuana, was based on insufficient evidence. As we have discussed in greater detail herein, we conclude that the trial court's finding that the respondent continued to abuse drugs was not clearly erroneous.

[19] In addition to arguing that the conduct upon which the trial court relied fell outside the scope of the specific steps, the respondent contends that the trial court used this conduct to improperly create "eleventh hour" concerns. We disagree. Contrary to the respondent's assertion, the trial court properly considered the respondent's actions up to and during trial to determine that he did not rehabilitate within a reasonable time. See Practice Book § 35a-7 (a) ("[i]n the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, *except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights*" [emphasis added]); *In re Kyara H.*, 147 Conn. App. 855, 879, 83 A.3d 1264 (trial court properly considered events occurring after petition to terminate parental rights had been filed in its determination that parent had not sufficiently rehabilitated), cert. denied, 311 Conn. 923, 86 A.3d 468 (2014).

[20] In reviewing the trial court's decision, "[b]ecause it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) *Ahmadi* v. *Ahmadi*, 294 Conn. 384, 398, 985 A.2d 319 (2009). Additionally, we do not have the jurisdiction to retry the facts of this case. *Dexter Yarn Co.* v. *American Fabrics Co.*, 102 Conn. 529, 538, 129 A. 527 (1925). The dissent seems to rely in part on alleged gaps in Franklin's report and on selective testimony from the trial that reflects some behavior by the respondent that was compliant with steps provided by the department and, based on this, attempts to discredit the expert's opinion as unsupported by clear and convincing evidence. In doing so, the dissent ignores testimony from other witnesses that was relied on by the trial court and that strongly supports the court's conclusions.

By way of example, with regard to the trial court's function to weigh evidence at trial, the dissent has essentially ignored the fact that the respondent declined to submit to a hair test, which was definitive of his drug use history. It is simply not our role to overrule the trial court for refusing to overlook the fact that, given the choice between reuniting with his son or maintaining his body hair, the respondent declined a haircut, especially given the testimony by a social worker, Charles Frazier, who noticed that the respondent appeared to be under the influence of marijuana at one or two of his counseling sessions. Additionally, the dissent has overlooked the testimonies of two department social workers, Amita Patel and Leon, who both testified to facts that the court relied on in terminating the respondent's parental rights.

Finally, as the dissent appropriately notes, the respondent refused to undergo further counseling until after he was reunited with his child. The trial court was certainly not unreasonable in agreeing with the department that the respondent should not have the authority to decide whether he should attend therapy, as this would turn the child protection system on its head and would seriously undermine the department's ability to facilitate an effective and sustainable reunification. Indeed, it is far more reasonable for the court to be concerned about, and to take into account in determining that the respondent has failed to rehabilitate, that he has conceded that he needed further therapy before he was adequately rehabilitated but has simultaneously taken the position that Shane should continue to suffer under his care in the meantime.

[21] Practice Book § 32a-1 (h) provides in relevant part: "Any confession, admission or statement, written or oral, made by the parent . . . of the child or youth after the filing of a petition alleging such child or youth to be neglected . . . shall be inadmissible in any proceeding held upon such petition against the person making such admission or statement unless such person shall have been advised . . . that any statements such person makes may be introduced in evidence against such person."

Practice Book § 35a-7A provides in relevant part: "If a party requests that the judicial authority draw an adverse inference from a parent's . . . failure to testify or the judicial authority intends to draw an adverse inference, either at the start of any trial or after the close of the petitioner's case-in-chief, the judicial authority shall notify the [parent] . . . that an adverse inference may be drawn from [the parent's] failure to testify."

[22] The language of § 46b-137 (d) is substantially similar to that of Practice Book § 32a-1 (h), and any dissimilarities are irrelevant to the present appeal.

[23] We find unpersuasive the respondent's claim that, even properly drawn, this inference did not prove that he failed to rehabilitate because criminal penalties for possession of marijuana have been reduced and the legislature has approved the use of marijuana for palliative medical purposes. Suffice it to say, regardless of marijuana's recent limited legalized status, the respondent was ordered to refrain from using it due to his extensive personal history of substance abuse.

———————————————